**DRYICE CORPORATION OF AMERICA et al. v. LOUISIANA DRY ICE CORPORATION et al.***

**SAME v. BELT et al.**

**BELT et al. v. DRYICE CORPORATION OF AMERICA et al.**

Nos. 6196, 6326, 6397.

Circuit Court of Appeals, Fifth Circuit.

Jan. 8, 1932.

In case No. 6196:

J. T. Prowell, of New Orleans, La., William W. Lesselbaum, of New York City, and George F. Thompson and Warner F. Thompson, both of Lockport, N. Y., for appellants.

Robert A. Hunter and Richard H. Switzer, both of Shreveport, La., and J. S. Belt and James E. Anderson, both of Amarillo, Tex., for appellees.

In case No. 6326:

Jones T. Prowell, of New Orleans, La., William W. Lesselbaum, of New York City, and Geo. F. Thompson and Warner F. Thompson, both of Lockport, N. Y., and Gillis A. Johnson, of Fort Worth, Tex., for appellants.

*Rehearing denied February 20, 1932.

J. S. Belt and Henry L. Ford, both of Amarillo, Tex., for appellees.

In case No. 6397:

J. S. Belt and Henry L. Ford, both of Amarillo, Tex., for appellants.

J. T. Prowell, of New Orleans, La., Wm. W. Lesselbaum, of New York City, and Geo. F. Thompson and Warner F. Thompson, both of Lockport, N. Y., and Gillis A. Johnson, of Fort Worth, Tex., for appellees.

Before SIBLEY, HUTCHESON, and WALKER, Circuit Judges.

WALKER, Circuit Judge.

Two suits were brought by DryIce Corporation of America and its assignee and licensee, DryIce Equipment Corporation (herein referred to as plaintiffs), one begun in January, 1930, in the federal court for the Western district of Louisiana against Louisiana Dry Ice Corporation and several individuals, and the other, begun in June, 1930, in the federal court for the Northern district of Texas against several individuals. The first-mentioned suit was brought to enjoin the use of the term or words "Dry-Ice" in the corporate title of the Louisiana Dry Ice Corporation, or in advertising or other printed matter in connection with the sale of that corporation's stock or of solid carbon dioxide not produced by DryIce Corporation of America or its licensee. The other suit was brought to enjoin the use by defendants therein of the term or words "Dry-Ice" in the corporate title of any corporation controlled by them, or in any advertising or other printed matter in connection with the sale of the stock of any such corporation or of solid carbon dioxide manufactured or to be manufactured by the defendants therein or by a corporation controlled or licensed by them. The bill in each of the cases asserted claims based on three alleged United States trademarks issued to DryIce Corporation of America, one, No. 200,934, registered July 14, 1925, for the term or words "Dry-Ice" for carbon dioxide in solidified form, mixtures or compounds; one, No. 215,799, registered July 27, 1926, for the same term or words for refrigerators, and one, No. 230,202, registered July 19, 1927, for the same term or words for empty containers adapted for storage, transportation or use of carbon dioxide in solidified forms, mixtures, or compounds. Each of the courts ruled that the term or words "Dry-Ice" did not constitute a valid trademark for solid carbon dioxide. The decree in each of the cases adjudged that the use by the defendants therein of the collocation of words "Dry-Ice" in the corporate title of a defendant corporation or in the title of a corporation licensed by defendants, and in the name and designation of the solid carbon dioxide to be produced by defendants or their licensees, and in the advertisements of defendants and of their business, tends to and is calculated to confuse and deceive the public, and has confused and deceived the public into believing that the defendants or their licensees are connected or affiliated with the DryIce Corporation of America or the DryIce Equipment Corporation and are authorized by them to operate under the license of the last-named corporations, and that the solid carbon dioxide manufactured or to be manufactured and sold or to be offered for sale by the defendants, or their licensees, is the solid carbon dioxide manufactured and sold by the DryIce Corporation of America, or the DryIce Equipment Corporation, or their licensees, and constitutes a wrongful appropriation by the defendants of the good will and trade-name property rights of the plaintiffs, and is unfair trading. By each of the decrees, the defendants in the suits were enjoined from using in the corporate name or title of a defendant, or a licensee of a defendant, the collocation of words "Dry-Ice" unless accompanied by the distinguishing statement: "That this is not the original and pioneer DryIce Corporation of America, or its successor or licensee;" and from using or employing in advertising or published matter relating to the business of the defendants or the products dealt in by them, or any of them, in any manner to identify the solid carbon dioxide manufactured or offered for sale by the defendants, except the products of the plaintiffs, the collocation of words, "Dry-Ice," unless accompanied, without anything intervening, by the distinguishing statement: "But this is not the original nor genuine 'Dry-Ice,' which is the solid carbon dioxide manufactured for many years by the pioneer DryIce Corporation of America, or its successors or licensees." The decree in the Texas case adjudged that the above-mentioned trade-marks No. 215,799, and No. 230,202, are in all respects valid and existing trade-marks duly registered in the United States Patent Office as such, and enjoined the infringement of those trade-marks by the defendants.

In 1924, the Prest-Air Corporation, the predecessor of DryIce Corporation of America, began the manufacture and sale of solid carbon dioxide as a refrigerant. Before that time, solid carbon dioxide was not in commercial use as a refrigerant. Solid carbon

dioxide has a temperature of about 110 degrees below zero. When it "melts" it passes directly into a dry, gaseous state. These properties make solid carbon dioxide an excellent dry refrigerant for foodstuff, particularly for the shipment of ice cream. That article and its properties have long been known to the public. Carbice Corp. v. Am. Patents Corp., 283 U. S. 27, 51 S. Ct. 334, 75 L. Ed. 819. In December, 1924, the Prest-Air Corporation adopted and commenced the use of the collocation of words or term "Dry-Ice" for its trade-mark, and soon thereafter caused its corporate title to be changed to DryIce Corporation of America. By advertising matter widely distributed throughout the country, DryIce Corporation of America made known to those engaged in business in which solid carbon dioxide may be used as a refrigerant its use of the term "Dry-Ice" in its corporate name, and to designate the solid carbon dioxide produced and marketed by it. Its business in selling the product and equipment manufactured by it rapidly increased; the quantities of solid carbon dioxide sold by it increasing from 295,801 pounds in 1925 to 27,376,006 in 1929. It provided and attached to the product and equipment sold by itself and its licensees distinguishing labels embracing the term "Dry-Ice." In October, 1929, the Louisiana Dry Ice Corporation was organized; one of its stated objects and purposes being the following: "Produce solid carbon dioxide (otherwise known as 'Quix Kold') for the isolation of inert gases, done and obtained from the consumption and use of natural gas, by methods and process commonly known and designated as Belt Process, as a licensee of J. S. Belt Helium Interests, and to produce carbon dioxide gas for such purposes, with the ultimate results of producing what is sometimes familiarly and more recently known as Dry Ice, same being known and to be known to the public as 'Quix-Kold.' " After that corporation had applied to the Securities Commission of Louisiana for authority to sell its stock and securities to the public, the above-mentioned suit in the Western District of Louisiana was brought. In the above-mentioned suit, in the District Court for the Northern District of Texas, admissions to the following effect were made: That named individual defendants in that suit were each and severally aware of the claims of the plaintiff therein to the right to the exclusive use of the term "Dry-Ice" as plaintiff's trade-name and trade-mark two years prior to the institution of that suit, and then knew and now know that plaintiffs therein claim the right to the exclusive use of the

term "Dry-Ice" as their trade-mark and trade-name, and that said term was duly registered by said plaintiffs in the United States Patent Office and in several states of the United States, including Texas, Louisiana, and Colorado; that said individual defendants, since May, 1929, have used the term "Dry-Ice" indiscriminately in various states of the Union, in intrastate and interstate commerce, in reference to the solid carbon dioxide, in various publications made by them, and in the corporate titles of corporations organized, or caused to be organized, by them, including Louisiana Dry Ice Corporation, and the Colorado Dry Ice Corporation, and had used the said term "Dry-Ice" as the name of the solid carbon dioxide produced or to be produced by defendants in that suit and in the marketing of the same in the states of Texas, Louisiana, and Colorado, and elsewhere, and that the defendants in that suit, unless restrained by decree of the court, will continue to use the term "Dry-Ice" indiscriminately in referring to solid carbon dioxide produced by the defendants therein in the advertisement of their product and as the name of their product in marketing and distributing the same, both in interstate and intrastate commerce, and that such action of named individual defendants therein has been taken and done without and against the consent or permission of the plaintiffs in that suit. The plaintiffs appealed from the decrees in both of the cases, and complain of the decrees in so far as they disallowed claims made by them. Defendants in each of the cases sued out a cross-appeal, and complain of the decrees in so far as they awarded relief to the plaintiffs.

▮ Under the Trade Mark Registration Act (15 USCA § 85) registration is not permitted of a mark which consists "merely in words or devices which are descriptive of the goods with which they are used, or of the character or quality of such goods." This provision forbids the use of a word or term as a trade-mark which, though it does not accurately describe the article referred to by it, is descriptive of characteristics or qualities of that article. Under the quoted provision, a word or collocation of words is not subject to registration as a trade-mark if it is descriptive of a quality or characteristic of the article with which it is used, though part of it is the name of something else which merely is like or resembles that article, the two things not being identical; as the word Rubberoid, used as the name of a product which contains no rubber, but has qualities possessed by rubber. Standard Paint Co. v. Trinidad Asph. Co., 220 U. S. 446, 455, 31.

S. Ct. 456, 55 L. Ed. 536. The term "Dry-Ice," being a combination of the descriptive adjective "dry" and the noun "ice," water in its solid or frozen state, when used with solid carbon dioxide, is descriptive in that that article in appearance somewhat resembles ice as does snow when compressed into a solid mass and frozen, and possesses qualities or characteristics of ice in having a temperature much below zero and in being serviceable as a refrigerant, but has a characteristic distinguishing it from ice in that by heat it is dissolved into dry gas instead of into water. That word or term, being descriptive of characteristics or qualities of the article with reference to which it was used, was not subject to be registered as a trade-mark for that article. Standard Paint Co. v. Trinidad Asph. Co., supra; Warner & Co. v. Lilly & Co., 265 U. S. 526, 44 S. Ct. 615, 68 L. Ed. 1161; Ungles-Hoggette Mfg. Co. v. Farmers' Hog & Cattle Powder Co. (C. C. A.) 232 F. 116. We conclude that the trial courts did not err in their rulings to this effect.

The term "Dry-Ice," being descriptive of qualities or characteristics of solid carbon dioxide, the product with reference to which it was used, the plaintiffs had no right to prevent the defendants or any of them from using that term in corporate names or in designating solid carbon dioxide produced or to be produced and marketed by them, if the latters' so doing was unaccompanied by any wrongful conduct having the effect of falsely representing the origin or source of their product or attempting to palm it off on the purchasing public as the product of the plaintiffs. Canal Company v. Clark, 13 Wall. 311, 327, 20 L. Ed. 581; Warner & Co. v. Lilly & Co., supra. "It is only when the adoption or imitation of what is claimed to be a trade-mark amounts to a false representation, express or implied, designed or incidental, that there is any title to relief against it. True it may be that the use by a second producer, in describing truthfully his product, of a name or a combination of words already in use by another, may have the effect of causing the public to mistake as to the origin or ownership of the product, but if it is just as true in its application to his goods as it is to those of another who first applied it, and who therefore claims an exclusive right to use it, there is no legal or moral wrong done. Purchasers may be mistaken, but they are not deceived by false representations, and equity will not enjoin against telling the truth." Canal Company v. Clark, supra. Defendants did not become chargeable with fraud or misrepresentation by merely using the term "Dry-Ice" in corporate names or in referring to solid carbon dioxide they were planning to produce, though at that time that term had acquired what is called a secondary meaning by reason of it becoming associated in the minds of members of the public with the product of a particular manufacturer. Where no exclusive right to the use of a word or term exists, a charge of fraud or misrepresentation (unfair competition) in the use of it by another cannot be sustained unless it is supported by proof. Elgin Watch Co. v. Illinois Watch Co., 179 U. S. 665, 674, 21 S. Ct. 270, 45 L. Ed. 365; Barton v. Rex Oil Co. (C. C. A.) 2 F.(2d) 402, 40 A. L. R. 424. When the two suits were brought none of the defendants therein was or had been engaged in the production or sale of solid carbon dioxide, but they were preparing to engage in that business, had used the term "Dry-Ice" in corporate names adopted by them or at their instance, and had manifested a purpose to use that term in referring to the solid carbon dioxide to be produced and marketed by them or their licensees. There was no evidence tending to prove that the defendants or any of them contemplated or had threatened to do anything amounting to unfair competition, or to wrongfully or fraudulently mislead or deceive any one as to the source or origin of their product. Nothing in the evidence indicated that they intended to use in connection with the solid carbon dioxide to be produced by them or their licensees any mark or label having any resemblance to a mark or label used on a product of the plaintiffs. The evidence failed to show that the defendants or any of them had done or intended to do any wrongful act with the intention of bringing about or facilitating the substitution of their product with purchasers who wanted a product of the plaintiffs and supposed that was what they were getting. Evidence introduced by the plaintiffs tended to prove that before the defendants were active in preparing to enter the field the catchy descriptiveness of the term "Dry-Ice," as applied to solid carbon dioxide as a refrigerant, had resulted in an extensive adoption of that term as the nontechnical name of that article; testimony of customers of the plaintiffs indicating that to them that term meant solid carbon dioxide, whether it was or was not a product of the plaintiffs or their licensee. One of those witnesses testified that "Dry Ice" is a crack-a-jack good name for solid carbon dioxide, and describes that article. A witness for the plaintiffs who was

886

an official of both of them testified that solid carbon dioxide was often referred to as "Dry-Ice" by uninformed persons, irrespective of its origin. The evidence as to the way the plaintiffs conducted the business of selling or marketing their products indicated a lack of probability of any purchasers or prospective purchasers being defrauded by being induced to buy the product of a defendant when the product of a plaintiff was desired. Evidence showed that products of the plaintiffs were sold in their own containers, marked with identifying labels. No evidence showed that any of the solid carbon dioxide produced by the plaintiffs had ever come, or was likely to come, to the possession of a purchaser of it otherwise than in a container having on it plaintiffs' label or identifying mark. No evidence indicated that the product of the plaintiffs had been or would be sold otherwise than to direct purchasers, and in containers so marked as to indicate the source of the contents. It cannot reasonably be inferred that such a purchaser, intending to get plaintiffs' product, would buy solid carbon dioxide from a manufacturer or dealer who claimed no connection with the plaintiffs, unless the product was offered in the trade dress customarily used by the plaintiffs for their products, or wrongful deception in some other way was practiced. Upjohn v. Wm. S. Merrell Chemical Co. (C. C. A.) 269 F. 209.

We conclude that the evidence failed to show that the defendants had done, or had planned, intended, or threatened to do, anything amounting to unfair competition or to a wrong against the plaintiffs, giving rise to a cause of action in favor of the latter.

The evidence did not show that the defendants had planned or threatened to sell or deal in refrigerators or empty containers, to use the term "Dry-Ice" with reference to those things, or to do anything having the effect of challenging claims of the plaintiffs based on the purported registered trademarks numbered 215,799 and 230,202. Such being the state of the evidence, it furnished no basis or support for an injunction restraining the doing by the defendants of what, so far as appears, they never intended to do.

The evidence failing to show an actual or threatened commission by the defendants of a wrong against which the plaintiffs were entitled to protection by injunction, the decrees appealed from were erroneous, in so far as they awarded relief in favor of the plaintiffs. The plaintiffs take nothing on their appeals. On the cross-appeals of defendants, those decrees are reversed.